# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **RONALD D. LESTER,** ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Civil Action No. 1:05cv00030 |
| ) | **MEMORANDUM OPINION** |
| ) | |
| ) | |
| **JO ANNE B. BARNHART**, ) | |
| Commissioner of Social Security, ) | By:   PAMELA MEADE SARGENT |
| Defendant ) | United States Magistrate Judge |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration in accordance with this memorandum opinion.

*I. Background and Standard of Review*

Plaintiff, Ronald D. Lester, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C.A. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C.A. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.''" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lester filed applications for DIB and SSI on or about February 4, 2003, alleging disability as of January 15, 1997, based on back pain, hip pain, ankle pain, knee pain, "nerve" problems and intestinal problems. (Record, ("R."), 55-57, 60, 335-36.) Lester's claims were denied both initially and on reconsideration. (R. at 45-47, 50, 51-53, 338-40, 345-47.) Lester requested a hearing before an administrative law judge, ("ALJ"), (R. at 54), and this hearing was held on June 3, 2004, at which Lester was represented by counsel. (R. at 358-78.)

By decision dated July 30, 2004, the ALJ denied Lester's claims. (R. at 13-20.) The ALJ found that Lester met the disability insured status requirements of the Act for disability purposes through December 31, 1998.[1] (R. at 19.) The ALJ found that Lester had not engaged in substantial gainful activity since January 15, 1997. (R. at 19.) The ALJ also found that Lester had a severe impairment, namely degenerative

---

[1]Thus, for DIB purposes, it must be determined whether Lester was disabled at some point on or prior to December 31, 1998.

disc disease of the lumbar spine, but he found that Lester did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19.) The ALJ further found that Lester's allegations regarding his limitations were not totally credible. (R. at 19.) The ALJ found that Lester retained the residual functional capacity to perform light work.[2] (R. at 19.) Thus, the ALJ found that Lester could not perform any of his past relevant work. (R. at 19.) Based on Lester's age, education and past relevant work experience and the Medical-Vocational Guidelines, ("the Grids"), found at 20 C.F.R. Part 404, Subpart P, Appendix 2, the ALJ found that Lester was not disabled as defined by the Act and was not eligible for benefits. (R. at 19-20.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

After the ALJ issued his decision, Lester pursued his administrative appeals,[3] but the Appeals Council denied his request for review. (R. at 6-9.) Lester then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). This case is before this court on Lester's motion for summary judgment filed August 16, 2005, and the Commissioner's motion for summary judgment filed September 19, 2005.

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

[3] Lester's request for review by the Appeals Council is not contained in the record.

-3-

## II. *Facts and Analysis*[4]

Lester was born in 1961, (R. at 55, 361), which classifies him as a younger person under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2005). Lester has a high school education with special education classes in reading and math, as well as some vocational training in masonry. (R. at 65, 361.) He has past relevant work experience as a coal miner, a carpet installer, a welder/builder of truck bodies and a brick mason. (R. at 61, 364-65.)

At his hearing, Lester testified that he suffered a coal mining injury resulting in a broken back and a collapsed lung. (R. at 362.) However, he stated that he did not undergo surgery. (R. at 363.) He further testified that approximately three years later, he was involved in a motorcycle accident and broke his right hip and three years after that, he fell from a horse, breaking a rib and puncturing his lung. (R. at 362, 374.) Lester stated that he was thereafter involved in yet another motorcycle accident, breaking his other hip and resulting in intestinal problems. (R. at 364, 374.) He testified that pins were placed in his left hip as a result of that accident and that pins had been placed in his right hip at some time in the 1980s. (R. at 363-64.) Lester also stated that he had arthritis in his back and difficulty using his hands, noting difficulty gripping. (R. at 368-69.)

Lester testified that his pain was continuous and that he had to use a cane daily

---

[4]Because Lester's arguments on appeal focus on his physical impairments, only the medical evidence relevant thereto will be discussed herein.

-4-

since his motorcycle accident.[5] (R. at 365.) He stated that although he had been prescribed a walker, he would rather use a cane. (R. at 365-66.) Lester estimated that he could walk for 15 minutes without interruption, taking small steps and walking up no inclines. (R. at 366.) He estimated that he could stand for 15 to 20 minutes without changing positions and that he had to use a cane for balance. (R. at 366.) He stated that when he sat, he had to continuously change positions. (R. at 367.) Lester testified that he also had difficulty with his knees, worsened by coal mining and carpet installation. (R. at 367.)

Lester testified that he saw Dr. Kwun on a monthly basis and received pain medication, which helped to alleviate his symptoms. (R. at 367-68.) He testified that he took Tylenol P.M. to help him sleep and used a heating pad, as well as a transcutaneous electrical nerve stimulation, ("TENS"), unit two or three times per week. (R. at 369.) Lester testified that he had to lie down approximately eight hours per day due to pain. (R. at 370.) He stated that he needed assistance bathing and grooming. (R. at 370.) Lester testified that he had no energy. (R. at 371.) He testified that certain weather made his joints ache. (R. at 368.)

Lester testified that friends and family picked him up and took him to their houses to visit. (R. at 372.) He further stated that family and friends did all of his shopping, and he noted that his fiancee took care of him. (R. at 372.) Lester stated that he was unable to help with household chores. (R. at 372.) He testified that although he enjoyed riding motorcycles and horses in the past, he was no longer able

---

[5]It is unclear from the record whether Lester was referring to the first or second motorcycle accident.

to do so. (R. at 372-73.) Instead, he testified that he mostly watched television. (R. at 373.)

In rendering his decision, the ALJ reviewed records from Dr. Doo Yung Kwun, M.D.; Dr. Faisal Chaudhry, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; Russell County school records; Russell County Medical Center; Johnston Memorial Hospital; Wellmont Bristol Regional Medical Center; University of Virginia Health System; Dr. Ludgerio Claustro, M.D.; Dr. Leopoldo Bendigo, M.D.; Abingdon Orthopaedic Associates; and Bristol Orthopaedic Associates. Lester's counsel submitted additional records from Dr. Kwun to the Appeals Council.[6]

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§

---

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 6-9), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

-6-

404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975).

-7-

Case 1:05-cv-00030-PMS   Document 16   Filed 10/12/05   Page 7 of 18   Pageid#: 96

Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d),416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

In his brief, Lester argues that the ALJ erred in determining that he retained the functional capacity to perform the full range of light work. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 12-17.) Lester further argues that the ALJ erred by failing to grant controlling weight to the opinions of his treating physician, Dr. Kwun. (Plaintiff's Brief at 7-12.) Finally, Lester argues that the ALJ improperly assessed his credibility and the effect of his pain on his ability to perform work-related activities. (Plaintiff's Brief at 17-22.)

Lester first argues that the ALJ erred by finding that he retained the functional capacity to perform the full range of light work. (Plaintiff's Brief at 12-17.) For the following reasons, I find that the ALJ's residual functional capacity finding is not supported by substantial evidence.

The record reveals that Lester suffered a coal mining injury on May 31, 1983, after a large piece of rock fell on him. (R. at 201.) He was hospitalized at Russell County Medical Center through June 10, 1983, under the supervision of Dr. Leopoldo Bendigo, M.D. (R. at 201-10.) His diagnoses upon discharge were left pneumothorax, T12 and L1 compression fractures, multiple left rib fractures, intestinal

ileus and multiple contusions and sprains. (R. at 202.) Lester continued to see Dr. Bendigo through May 15, 1985. (R. at 299-322.) Over this time period, Lester's condition improved. Although his fracture healed, he continued to complain of thoracolumbar pain and exhibited tenderness on examination. (R. at 299-322.) It appears that Lester took analgesics for the majority of this time, but he was prescribed Dolobid in January 1985 and Darvocet in April 1985. (R. at 300, 303.) Physical examinations over this time period consistently revealed a kyphotic deformity at the level of injury. (R. at 311, 313-14, 316.) Straight leg raising was consistently 90 degrees bilaterally, and Lester exhibited no weakness or sensory loss. (R. at 301, 303-10.)

On January 10, 1984, Dr. Melvin L. Heiman, M.D., saw Lester at his counsel's request. (R. at 323-24.) Dr. Heiman stated that Lester reported some improvement, but continued to suffer from mid-back and low-back discomfort. (R. at 323.) Lester further reported some vague hip numbness, but no prominent lower extremity symptoms. (R. at 323.) Straight leg raising was minimally positive on the left at 85 degrees, but negative on the right. (R. at 323.) Lester's neurologic examination was grossly intact. (R. at 323.) Dr. Heiman noted that x-rays revealed that Lester's back fracture was "well on the way towards healing." (R. at 323.) Dr. Heiman noted that Lester's kyphotic deformity could be a progressive problem, requiring fusion with stabilization. (R. at 323.) He further noted that there was no guarantee that Lester would be able to return to his usual work duties even with surgical management. (R. at 323.)

On March 1, 1984, Dr. William A. McIlwain, M.D., an orthopaedist, evaluated

-9-

Case 1:05-cv-00030-PMS   Document 16   Filed 10/12/05   Page 9 of 18   Pageid#: 98

Lester. (R. at 325-26.) Lester reported that he continued to experience chronic back pain, especially worsened by weather changes. (R. at 325.) He also complained of a popping in his back, which Dr. McIlwain opined was facet popping. (R. at 325-26.) Range of motion of the lumbar spine was limited, but straight leg raising was negative bilaterally, and no significant paralumbar spinal spasm was noted. (R. at 325-26.) Reflexes were normal bilaterally. (R. at 326.) Dr. McIlwain noted that Lester had good motion in the lower extremities. (R. at 326.) He opined that Lester would likely experience a great deal of permanent pain and impairment. (R. at 326.) He further opined that Lester would not be able to return to heavy labor. (R. at 326.) However, Dr. McIlwain reported that Lester had great potential to return to work not involving heavy labor with or without surgery, but noting that surgery would likely be necessary for pain relief. (R. at 326.)

Lester was admitted to Russell County Medical Center on April 30, 1985, after a dirt bike accident. (R. at 194-200.) X-rays revealed a fracture of the right hip for which he underwent an open reduction and right hip nailing. (R. at 194, 196, 198, 200.) Lester was released on May 4, 1985. (R. at 194.)

On April 4, 1993, Lester presented to the emergency department at Russell County Medical Center after falling from a horse. (R. at 193.) He complained of right rib pain, right elbow pain and right knee pain. (R. at 193.) He was diagnosed with rib contusions and a closed head injury with abrasions. (R. at 193.) Lester was prescribed Toradol. (R. at 193.)

Lester saw Dr. Doo Yung Kwun, M.D., from February 19, 1997, through July

10, 2003, for treatment. (R. at 92-154.) Over this time period, Lester was diagnosed with chronic low back pain, (R. at 92-93, 95-124, 127, 130, 132-33, 136-37, 140, 144-54), arthritis, (R. at 101), chronic pain, (R. at 131, 134-35, 138-39, 141-43), pain and stiffness in the right hip, (R. at 96, 113, 135-37, 144), and right leg pain, (R. at 103, 133, 141.) He was prescribed Lortab, Lorcet, Vioxx, Oxycontin, Percocet and Celebrex. (R. at 92-149, 151-54.)

On November 20, 1997, x-rays of the lumbar spine showed the old T12 fracture with a decrease in height of about 40 percent anteriorly with fusion of the T12-L1 anteriorly. (R. at 263.) Also revealed was splaying of the posterior elements of the T12-L1 level with associated kyphosis and mild degenerative disc disease at the L1-2, L4-5 and L5-S1 levels of the spine with facet joint disease bilaterally at the L4-5 and L5-S1 levels. (R. at 263.) An MRI of the lumbar spine revealed facet joint disease at the L3-4, L4-5 and L5-S1 levels, as well as an annular tear at the L4-5 level. (R. at 262.) A mild diffuse disc bulge with more focal small central disc protrusion was noted, as well as facet joint disease and ligamentum flavum thickening, all producing minimal central canal stenosis. (R. at 262.) Likewise, x-rays of the lumbar spine, taken on December 4, 1997, revealed Lester's old compression fracture, which was fused anteriorly with L1, as well as mild kyphosis. (R. at 260.) Also revealed were mild retrolisthesis of the L1 level relative to L2, which was accentuated during extension, as well as degenerative disc disease at the L1-2, L4-5 and L5-S1 levels. (R. at 260.)

Lester saw Dr. Ludgerio Claustro, M.D., from December 11, 1997, through December 14, 2000, at Dr. Bendigo's referral. (R. at 265-98.) On December 11,

1997, Lester was diagnosed with chronic pain and discomfort with post-traumatic arthropathy due to his previous injuries. (R. at 298.) He was prescribed Anexsia. (R. at 298.) On March 31, 1998, Dr. Claustro noted that Lester's physical activity was restricted to only a very mild degree. (R. at 297.) He was diagnosed with chronic pain of the left ankle with chronic sprain. (R. at 297.) On April 29, 1998, a physical examination revealed tenderness along the left ankle area and low back area. (R. at 296.) By January 28, 1999, Dr. Claustro noted some definite discomfort on maneuver such as rotation, extension and flexion of the foot and ankle. (R. at 289.) On May 5, 1999, Lester reported occasional difficulty walking and getting up from a supine and sitting position. (R. at 287.) Dr. Claustro noted tenderness along the ankle area and over the low back area. (R. at 287.) He was again diagnosed with chronic ankle sprain. (R. at 287.) On August 10, 1999, Dr. Claustro noted that Lester was able to maintain symptom control of his ankle sprain with medications. (R. at 285.)

On September 7, 1999, Lester presented to the emergency department at Johnston Memorial Hospital with complaints of right flank pain with painful urination, nausea and diarrhea for the previous two days. (R. at 232-34.) He was diagnosed with possible ureterolithiasis and was prescribed Percocet and Bactrum. (R. at 234.)

On September 27, 1999, Dr. Claustro administered a Depo Medrol injection after Lester exacerbated his chronic ankle sprain due to an inversion injury while walking. (R. at 284.) On October 25, 1999, Lester was prescribed hydrocodone. (R. at 283.) On December 1, 1999, Lester reported that his ankle pain had begun to radiate up into his knees and legs. (R. at 282.) A physical examination revealed

-12-

tenderness over the paraspinal muscles of the lumbar region and over the ankle region with stiffness of the muscles of the calf all the way to the posterior thigh. (R. at 282.) Dr. Claustro recommended stretching exercises to avoid any diffuse atrophy or ankylosis. (R. at 282.) On January 17, 2000, Dr. Claustro temporarily discontinued Lester's use of hydrocodone. (R. at 280.) Lester remained on Oxycontin. (R. at 280.) However, on January 25, 2000, although Dr. Claustro noted that Lester was doing much better, he was again prescribed hydrocodone. (R. at 279.) On February 23, 2000, Lester was diagnosed with chronic ankle sprain and generalized joint pains. (R. at 281.) He was prescribed Oxycontin and amitriptyline. (R. at 281.) On April 26, 2000, Lester was advised to consult a pain center and obtain a functional capacity evaluation. (R. at 276.) However, on May 22, 2000, Dr. Claustro noted that Lester had not gone to the pain clinic. (R. at 275.) On November 16, 2000, Dr. Claustro noted that Lester might have a regional or localized fibromyalgia, causing persistent pain and discomfort. (R. at 269.) On November 27, 2000, Dr. Claustro noted that hydrocodone and Oxycontin produced good pain relief. (R. at 267-68.) Nonetheless, on December 4, 2000, Lester's dosage of hydrocodone was increased. (R. at 266.) By December 14, 2000, Lester complained of increased discomfort. (R. at 265.) He noted that the twice daily Oxycontin was no longer helping, and Dr. Claustro increased the dosage to three times daily. (R. at 265.)

Lester was admitted to Wellmont Bristol Regional Medical Center on August 19, 2001, after being involved in an alcohol-related motorcycle accident. (R. at 237-46.) He was diagnosed with a ruptured spleen, left rib fractures, a fractured left femur, a hip fracture and a pneumothorax. (R. at 237, 251-59.) Lester underwent surgery to repair a chronic diaphragmatic hernia, as well as an open reduction and internal

fixation of the left hip fracture. (R. at 239-43.) He was discharged on August 25, 2001, with prescriptions for Oxycontin and Percocet. (R. at 237-38.)

Lester presented to Russell County Medical Center on December 26, 2001, with complaints of lumbar back pain and spasm for the previous five weeks. (R. at 190-91.) It was noted that he was in moderate distress and exhibited a limited lumbar range of motion with tenderness and spasm. (R. at 191.) He was diagnosed with chronic back pain. (R. at 191.) Although Norflex, Vioxx and Skelaxin were recommended, Lester refused, stating that he could not take those medications. (R. at 191.)

Lester saw Dr. Faisal Chaudhry, M.D., on May 5, 2003, for an evaluation of his back and hip pain. (R. at 155-60.) Lester reported that his hip pain was worsening, noting that he could not sit or stand for longer than 10 minutes without interruption. (R. at 155.) He estimated that he could walk approximately 50 yards and could lift five pounds frequently and 10 pounds occasionally. (R. at 155.) He stated that he required a cane to help relieve pressure off of his hip so he could walk. (R. at 155.) Lester further complained of constant low back pain that radiated into both lower extremities, the left more than the right. (R. at 155.) He also complained of bilateral knee pain and stiffness, making it difficult for him to bend and squat. (R. at 156.) A physical examination revealed paravertebral muscle spasm and tenderness in the lumbosacral spine. (R. at 157.) Bilateral hip tenderness also was noted. (R. at 157.) Dr. Chaudhry noted that Lester had a diminished range of motion of the hips and the dorsolumbar spine. (R. at 159.) He diagnosed bilateral hip pain. (R. at 160.)

-14-

Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on May 20, 2003, indicating that Lester could perform light work, reduced by an ability to sit for only two hours in a eight-hour workday. (R. at 162-70.) Dr. Surrusco further found that Lester could only occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 164.) He imposed no manipulative, visual, communicative or environmental limitations. (R. at 165-66.) Dr. Surrusco found Lester's subjective allegations partially credible. (R. at 164, 170.) This assessment was affirmed by Dr. Donald R. Williams, M.D., another state agency physician, on July 30, 2003. (R. at 169.)

Lester again saw Dr. Kwun from August 11, 2003, through July 7, 2004. (R. at 211-23, 355-57.) Over this time period, Dr. Kwun consistently found that Lester experienced severe pain and stiffness of the back. (R. at 211-20, 355-57.) He was diagnosed with chronic back pain and was prescribed Oxycontin. (R. at 211-20, 355-57.) On May 6, 2004, Dr. Kwun completed a Physical Assessment Of Ability To Do Work-Related Activities. (R. at 221-23.) He found that Lester could lift and/or carry no amount of weight, that he could stand and/or walk for a total of less than one hour, but for only 15 minutes without interruption and that he could sit for a total of less than one hour, but for only a few minutes without interruption. (R. at 221-22.) Dr. Kwun further found that Lester could never climb, stoop, kneel, crouch or crawl, but could occasionally balance. (R. at 122.) He further found that Lester's abilities to push and/or pull were limited by his back pain. (R. at 222.) Finally, Dr. Kwun found that Lester could not work around heights, moving machinery, temperature extremes, humidity or vibration. (R. at 223.) Dr. Kwun noted that he was basing his findings on Lester's severe lumbar spine pain with radiation into both legs. (R. at 221-23.)

-15-

I will first address the ALJ's determination that Lester retained the functional capacity to perform the full range of light work. For the following reasons, I find that substantial evidence does not support this determination. Light work requires the ability to lift items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005). Further, a job falls in this category when a good deal of walking or standing is required or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005). The ALJ accepted the opinions of the state agency physicians over those of Dr. Kwun and Dr. Chaudhry. (R. at 17.) However, the state agency physicians concluded that Lester could perform light work diminished by an ability to stand and/or walk for at least two hours in an eight-hour workday. (R. at 163.) The state agency physicians noted that Lester's ability to stand and/or walk was "significantly reduced." (R. at 163.) It does not appear that the ALJ considered this finding in concluding that Lester could perform the full range of light work. For instance, the ALJ did not impose a sit/stand option on Lester's work-related abilities. Moreover, the undisputed evidence of record shows that Lester suffers from at least degenerative disc disease of the lumbar spine and uses a cane to assist him with walking. Furthermore, the state agency physicians found that Lester could only occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 164.) However, although the ALJ stated that he was accepting the opinions of the state agency physicians, it does not appear that these limitations were considered in finding that Lester could perform the full range of light work.

I further note that the ALJ relied on the Grids in finding that Lester was not

disabled.  The regulations provide that if a claimant has difficulty performing the manipulative or postural functions of some work, such as reaching, handling, stooping, climbing, crawling or crouching, then a claimant has a nonexertional impairment.  *See* 20 C.F.R. §§ 404.1569a(c), 416.969a(c) (2005).  Although an ALJ may not use the Grids to determine disability if a claimant suffers from a nonexertional impairment, not every nonexertional impairment rises to the level of a nonexertional impairment so as to preclude reliance on the Grids.  *See Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989).  In *Walker*, the Fourth Circuit stated that "[t]he proper inquiry ... is whether the nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable." 889 F.2d at 49 (citing *Grant v. Schweiker*, 699 F.2d 189 (4th Cir. 1983)).  A nonexertional limitation is one that places limitations on functioning or restricts an individual from performing a full range of work in a particular exertional category. *See Gory v. Schweiker*, 712 F.2d 929, 930 (4th Cir. 1983).

Here, even assuming that the ALJ properly weighed the medical evidence and properly accepted the findings of the state agency physicians over those of Dr. Kwun and Dr. Chaudhry, I, nonetheless, find that substantial evidence does not support the ALJ's finding that Lester could perform the full range of light work and, based on the Grids, was not disabled.  As previously mentioned, the state agency physicians concluded that Lester's ability to stand and/or walk was "significantly reduced" and that he could only occasionally climb, balance, stoop, kneel, crouch and crawl.  (R. at 163-64.)  Given the regulations and relevant case law cited above, I find that it is unclear from the record whether such limitations constituted nonexertional limitations, thereby precluding reliance on the Grids.  I further note that, although Lester does not

-17-

challenge on appeal any findings relating to his alleged mental condition, because this was raised before the ALJ, he had a duty to elicit the testimony of a vocational expert regarding what impact, if any, Lester's nonexertional limitations would have on his work-related abilities.

For all of these reasons, I cannot find that substantial evidence supports the ALJ's finding that Lester retained the functional capacity to perform the full range of light work. Thus, I find it unnecessary to address the remainder of Lester's arguments.

### III. Conclusion

For the foregoing reasons, Lester's and the Commissioner's motions for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ to determine whether Lester suffers from impairments rising to the level of nonexertional impairments that would preclude reliance on the Grids and, if so, to elicit the testimony from a vocational expert relating to how those limitations impact his work-related abilities.

An appropriate order will be entered.

DATED: This 12th day of October, 2005.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE